# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **JOHN MCGLONE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DR. ROBERT BELL, in his official** | ) | |
| **capacity as President of Tennessee** | ) | |
| **Technological University; ED BOUCHER,** | ) | **No. 2:10-0029** |
| **individually and in his official capacity** | ) | **Judge Trauger** |
| **as Dean of Student Affairs at Tennessee** | ) | |
| **Technological University; MARK H.** | ) | |
| **OCHSENBEIN, individually and in his** | ) | |
| **official capacity as Director of Student** | ) | |
| **Activities at Tennessee Technological** | ) | |
| **University; MICHAEL LAMBERT,** | ) | |
| **individually and in his official capacity** | ) | |
| **as Police Officer for University Police** | ) | |
| **Department of Tennessee Technological** | ) | |
| **University,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court are the plaintiff's Motion For Preliminary Injunction (Docket Entry No. 2) and a Motion To Dismiss Defendants In Their Individual Capacities filed by the defendants (Docket Entry No. 13). For the reasons discussed herein, the plaintiff's motion will be denied and the defendants' motion will be granted.

The pertinent facts are drawn from the Verified Complaint (Docket No. 1) and the Affidavit of John McGlone (Docket No. 3), as well as from the photographs and documents attached to the Motion For Preliminary Injunction (Docket No. 2-1 through 2-22), which were authenticated in the McGlone affidavit. The court provided the defendants with an adequate

1

opportunity to respond to the motion for injunctive relief. The defendants filed a brief, but they did not file any affidavits to challenge the veracity of the facts as stated by the plaintiff. The court is not required to hold an evidentiary hearing on a motion for a preliminary injunction if, as here, the defendants do not dispute the material facts presented by the plaintiff and the issues before the court are primarily questions of law. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552-53 (6th Cir. 2007); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312-13 (11th Cir. 1998). *See also Huk-A-Poo Sportswear, Inc. v. Little Lisa, Ltd.*, 74 F.R.D. 621, 624 n.1 (S.D.N.Y. 1977) ("Because a "verified complaint or affidavits standing undenied may be presumed true," 7 Moore's P 65.04(3) at 65-63, a court may grant a preliminary injunction on the basis of pleadings and affidavits, even where no witnesses have been called. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1204-05 (2d Cir. 1970)."). In ruling on the motions, the court accepts as true plaintiff's statement of the facts.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff McGlone is a professing evangelical Christian who resides in Breeding, Kentucky. As a tenet of his faith, he conveys his beliefs and convictions to others in public. He does this orally, either in small groups or in one-on-one conversations and through distribution of literature and display of signs. Plaintiff often discusses issues of the day from his religious perspective. To share his faith, the plaintiff frequently visits public universities and expresses his religious beliefs with students and others found on campus. Plaintiff's message relates to the hope that he believes Jesus Christ offers for humanity. In plaintiff's view, there is no better place to share his faith than on a college campus.

2

The plaintiff makes no attempt to solicit funds or membership in any organization. He does not try to harass anyone or encourage violence, and he expresses himself in a peaceful manner. He claims that he does not try to force anyone to listen to him or to accept the literature he distributes; he seeks only to share his beliefs and to engage other persons in respectful conversation and rational dialogue about the teachings and benefits of Christianity.

Tennessee Technological University ("TTU") is a public university located in Cookeville, Tennessee. The TTU campus blends in with the City of Cookeville; other than a few signs, there are no demarcations signifying where TTU ends and the City of Cookeville begins. Various city streets run around and through the TTU campus. The city streets that run through campus include University Drive, Dixie Avenue, North Willow Avenue, and North Peachtree Avenue. TTU's campus is bounded by 12th Street to the north, a railroad to the east, Pine and North Franklin Avenues to the west, and various residences, commercial establishments, and public streets to the south. The sidewalks on the perimeter of the TTU campus and on streets running through campus are indistinguishable from City of Cookeville sidewalks. There are no fences or barricades on the perimeter of the campus to prevent members of the general public from gaining access to the campus. The TTU campus is open to the public at large, and individuals not associated with the university have free access onto the grounds. The campus contains many open, accessible areas on the grounds, including sidewalks, park areas with benches and tables, pedestrian malls, and other public ways.

Case 2:10-cv-00029   Document 29   Filed 08/16/10   Page 3 of 20 PageID #: 205

On April 6, 2009, the plaintiff called TTU to learn how he could express his religious views on campus. He spoke with Susan Henry in the Student Information Office, and she told him to stop by the office when he wanted to speak.[1]

The next day, on April 7, 2009, Mr. McGlone and his friend, Shawn Holes, visited the TTU campus for the specific purpose of expressing a Christian message to students by conversation, literature distribution, and display of signs. McGlone wished to speak in any open, outside area of the campus where students could be found, including but not limited to, the south patio/plaza area outside the University Center, Sherlock Park, the Main Quad near South Hall, and the sidewalks along 12th Street, Dixie Avenue, North Willow Avenue, North Peachtree Avenue, and 7th Street. (Docket Nos. 2-2 through 2-14, Exs. B through O.)

Upon arriving at the TTU campus, McGlone and Holes went to the University Center to meet with Ms. Henry. They noticed a few students on the south patio outside the University Center (Docket No. 2-1, Ex. B) and immediately started talking to them before checking in with Ms. Henry. The south patio has several tables and chairs and flows into a large plaza area. (Docket Nos. 2-2 & 2-3, Exs. C & D.) Students gather in this area, which resembles a pedestrian mall.

After a few minutes, McGlone went inside the University Center to find Ms. Henry, while Holes stayed outside and talked with students. Ms. Henry was not present that day, so McGlone spoke with Mark Ochsenbein, Director of Student Activities. Mr. Ochsenbein said that McGlone could speak on the north patio. (Docket No. 2-15, Ex. P.) McGlone asked if he could

---

[1]It is not clear why Ms. Henry did not mention to Mr. McGlone that there was a written policy applicable to such requests.

4

use the south patio/plaza instead, there being more students and tables and chairs in that area. Ochsenbein declined McGlone's request and told him that the north patio was his only option. McGlone asked to see the written policy limiting expressive activity to the north patio. Ochsenbein became agitated and said that if McGlone did not use the north patio he would call the university police and have him arrested.

McGlone went outside to inform Holes of Ochsenbein's comments. Holes agreed that the north patio was inadequate for their expressive activities, as there were few students and no tables and chairs. McGlone went back inside the University Center and spoke to Ed Boucher, Dean of Student Affairs. McGlone explained why he and Holes did not want to use the north patio, and he asserted that their use of the south patio/plaza area would in no way cause a disruption. Dean Boucher said that he would check university policy and get back to McGlone.

McGlone then returned to the south patio outside the University Center, where he and Holes, without permission, continued to distribute tracts and engage others in conversation. A few minutes later, TTU police officer Michael Lambert approached and informed McGlone and Holes that they had to stop their activities and leave campus or they would be arrested for trespass. McGlone and Holes left the campus.

The following day, on April 8, 2009, at approximately 9:00 a.m., McGlone telephoned Dean Boucher to find out whether he could speak on campus. Dean Boucher said that plaintiff could speak, but he needed to follow TTU's campus use policy. (Docket No. 2-19, Ex. T.) According to Dean Boucher, the policy required plaintiff to submit a written application before speaking (Docket No. 2-20, Ex. U) and to submit that application in person at least 14 business days prior to speaking.

5

The policy, entitled "Use of Campus Property And Facilities," states that its purpose "is to provide a uniform basis upon which the institutions and area vocational-technical schools governed by the Tennessee Board of Regents can regulate the use of campus property and facilities by affiliated and non-affiliated groups, organizations and individuals." (Docket No. 2-19 at 1, 0240-1-1.01.) The policy also provides that it

> is intended to provide a system of regulations calculated to promote the orderly conduct of activities on campus property and in campus facilities: to prevent interruption of or interference with normal missions, processes and functions of the institutions and schools; to promote an educational rather than commercial atmosphere on campus; to prevent commercial exploitation of students; to preserve residential tranquility and to prevent use of campus property and facilities contrary to federal, state, or local law or regulation, or policies or regulations of the Tennessee Board of Regents, or the institution and schools.

(*Id.*) The policy further provides that the campuses and facilities of the institutions and schools are restricted to students, faculty, staff and guests of the institutions or schools, except when part or all of the campuses, its buildings or facilities are open to the general public for a designated time and purpose or "when use by non-affiliated groups, organizations or individuals has been granted or approved pursuant to the provisions of this policy or the policy of the individual institution or school." (*Id.* at 1, 0240-1-1.02(2)(a).) The policy specifically states that "[n]on-affiliated groups, organizations and individuals may utilize campus property and facilities on a temporary basis for the purpose of religious worship or evangelical activities subject to the specified registration requirements and procedures." (*Id.* at 5, 0240-1-1.04.)

The policy requires all non-affiliated individuals, groups, or organizations desiring use of campus property or facilities or desiring to distribute literature on campus to submit a written application for registration of the proposed activity at least fourteen (14) days in advance (excluding weekends and holidays) to the appropriate official at the institution or school. (*Id.* at

6

2, 0240-1-1.02(4)(b).)   In the event an applicant misses the 14-day advance notice deadline, "the President of the institution or director of the area school, or his or her designee, may approve applications for registration filed at a later time upon such official's determination that the use of property requested can be reasonably accommodated and that adequate cause exists for late filing of the application for registration." (*Id.*)  Approval of a late application is within the sole discretion of the President, the director of the area school, or his or her designee.  Applications must be submitted on a designated form.  (*Id.*)

The policy permits officials to deny applications for use of campus property in nine (9) specific circumstances: (1) where the requested use would cause substantial disruption or interference with the normal activities of the institution or school conducted in the course of its lawful mission, processes and functions; (2) the requested use would be contrary to federal, state, or local law or regulation, or policies or regulations of the Tennessee Board of Regents, or the institution or school; (3) the applicant or sponsor failed to provide accurate and complete information on the application for registration; (4) the applicant or sponsor has been responsible for policy violations during previous registered use of campus property or facilities; (5) approval for the use of property or facilities has previously been given to another group, organization or individual for the time(s) and location(s) requested; (6) use of the property or facilities requested would be impossible due to the set-up time and/or take down time required for other previously scheduled activities at the requested location immediately before and/or after the requested use, or due to other extenuating circumstances; (7) the activity is of such nature or duration that it cannot reasonably be accommodated in the particular area for which application is made, provided that in such event, an alternative on campus site, if available for the activity, may be

7

proposed by the institution or school; (8) the activity creates or would create a danger, or dangerous condition impacting on the health, safety, and welfare of others; and (9) such use conflicts or would conflict with existing contractual obligations of the institution or school. If an application is denied for a reason stated in paragraphs (1), (2), (4), (7), (8), or (9), the applicant has a right to appeal the denial to the President or area school director or his or her designee. (*Id.* at 4, 0240-1-1.03(e).)

Plaintiff McGlone, believing this policy burdensome on speech, requested to talk to Dean Boucher about his concern in person. McGlone did not complete the application required by the policy, and Dean Boucher refused to meet with him.

Later on April 8, 2009, McGlone met with Holes, and they decided not to return to TTU's campus because they did not want to submit an application and wait for 14 days. Instead, they went to a location that they thought was off TTU's campus, about 150 feet north of the intersection of Dixie Avenue and 9th Street. (Docket Nos. 2-17 & 2-18, Exs. R & S.) This area looked to them like a city sidewalk, and they claim that they believed it to be a city sidewalk. Upon arrival, they began talking to people, displaying signs, and distributing literature. Approximately 15 minutes after their arrival, Dean Boucher approached McGlone and Holes and advised them that they could not speak on that sidewalk without university permission because the sidewalk was on university property.

McGlone has not returned to TTU's campus since this incident, he says for fear of arrest. He asserts that TTU's campus use policy serves to chill and deter his expression and that many of the provisions adversely affect his speech. TTU requires him, as an individual speaker or as part of a small group, to apply in person and to supply 14 business days advance notice of his

desire to speak. The plaintiff claims that this requirement affects his message because he does not necessarily know where he will be 14 business days in advance. Weather could dictate a sudden change in schedule. Also, he often likes to speak to the issues of the day, which requires him to be spontaneous. He claims that the notice requirement eliminates spontaneity and that he sees no good reason for this requirement.

The TTU application requires any outside speaker to identify a program title and purpose, state whether literature will be distributed, and state whether the speaker qualifies as an assembly, political or religious. The plaintiff claims that these requests deter him because he does not want to divulge personal information like this just to share his beliefs. He is afraid that the information will be used to discriminate against him.

Based on the language of the campus use policy, TTU specifically allows individuals unaffiliated with the university, like the plaintiff, to speak on campus, but the policy does not specify where the plaintiff can speak or how long he can speak. The plaintiff believes that TTU officials used this "open-ended discretion" to discriminate against him and his particular message by placing him in an isolated area like the north patio, "where no one ever goes." If not for the campus use policy and the actions of the defendants, the plaintiff claims that he would immediately return to TTU to share his message.

On June 23, 2009, counsel for the plaintiff sent a six-page letter to TTU President Dr. Robert Bell, Dean Boucher, and Police Chief Gay Shepherd, outlining the legal reasons why plaintiff believed his First Amendment rights had been violated. (Docket No. 2-21.) On July 22, 2009, an Associate General Counsel with the Tennessee Board of Regents sent a responsive letter to plaintiff's counsel. (Docket No. 2-22.) The letter stated in part:

9

As you appear to be aware, TTU may impose reasonable time, place and manner restrictions pertaining to the property under its control. TTU may restrict access to its property and facilities in a manner consistent with its pedagogical mission in order to prevent interruption of or interference with normal missions, processes and functions of the institution. To that end, TTU has in place a policy and process which it consistently applies in a viewpoint-neutral manner allowing affiliated and non-affiliated groups, organizations and individuals the ability to request use of campus property and facilities. Courts have consistently held as constitutional, policies and practices similar to those in place at TTU.

TTU welcomes freedom of expression and speech on its campus. If Mr. McGlone wishes to utilize the TTU campus to share his religious beliefs with students and staff, and to distribute literature, he must first follow the appropriate procedure and fill out an application not later than 14 days prior to the date of his requested use. Should he fail to do so, he will be denied access to the campus.

On March 29, 2010, McGlone filed suit in this court under 42 U.S.C. § 1983 against Dr. Bell, in his official capacity as President of TTU, and against Dean Boucher, Ochsenbein, and Officer Lambert in their official and individual capacities, seeking declaratory and injunctive relief and nominal damages. In his first cause of action for violation of the Free Speech Clause of the First Amendment, plaintiff alleged that his religious speech is protected speech under the First Amendment and that TTU's policy and practices, and enforcement thereof, including but not limited to TTU's campus use policy, are vague and overbroad; restrain constitutionally-protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy; chill the free speech and free exercise of religion of plaintiff and of other third-party citizens; allow the exercise of unbridled discretion; are not narrowly tailored to achieve any legitimate government purpose; and fail to leave open alternative avenues for expression. He also alleged that defendants have no compelling or legitimate reason to justify their "censorship" of the religious viewpoints sought to be expressed by plaintiff.

10

In the second cause of action, for violation of the Due Process Clause of the Fourteenth Amendment, plaintiff alleged that defendants' policies are vague and lack sufficient objective standards to curtail the discretion of officials and that this allows defendants ample opportunity to enforce the policies in an *ad hoc*, arbitrary, and discriminatory manner. Plaintiff alleged that defendants have no compelling or legitimate reason to justify their vague policies.

In the motion for a preliminary injunction, plaintiff asks the court to enjoin the defendants and their agents, servants, employees, attorneys, and all persons and entities in active concert or participation with them, directly or indirectly, from applying the TTU campus use policy on its face and from applying the campus use policy to prevent plaintiff from engaging in his desired and constitutionally protected speech activities. In the absence of a preliminary injunction, plaintiff asserts that he will suffer irreparable injury in the loss of his rights and freedoms guaranteed by the United States Constitution.

## ANALYSIS

"A preliminary injunction is an extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held." *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). Whether to grant a preliminary injunction is left to the discretion of the court. *Id.* The court must assess four factors to determine if a preliminary injunction is warranted: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction on the public interest. *Id.* Whether the plaintiff is likely to succeed on the merits is a determination of law. *Id.*

11

The plaintiff asserts that he can show a likelihood of success on the merits of his argument that TTU's campus use policy is an unconstitutional prior restraint. He contends that the policy is not narrowly tailored to a significant government interest because (a) it requires individuals or small groups to file a written application for registration to obtain permission to engage in any form of expression on the TTU campus; (b) it requires fourteen (14) business days' advance notice of speech; and (c) it requires individuals or small groups to divulge the identity of speakers and the content of speech. He further argues that he can show the likelihood of success on the merits of his argument that the policy grants TTU officials unbridled discretion in the decision-making process. Officials may waive the 14-day notice requirement for any reason, and the policy does not specify where, when, or for how long an applicant can speak. Plaintiff claims that the infringement of his First Amendment rights constitutes irreparable harm, a preliminary injunction will not cause harm to the defendants, and the public has an interest in preventing the violation of a party's constitutional rights.

The defendants argue that the plaintiff lacks standing to pursue his First Amendment argument that the campus use policy is overbroad. They point out that the plaintiff never submitted an application to TTU under the campus use policy, nor did he seek a waiver of the 14-day advance notice provision. Consequently, defendants argue, the plaintiff cannot show an injury-in-fact from TTU's campus use policy. Additionally, defendants contend that the plaintiff cannot show likelihood of success on the merits or the threat of irreparable harm, and an injunction would harm the defendants and impair the public interest.

**A. Plaintiff's standing**

Standing is a fundamental element of federal jurisdiction over a "case" or "controversy" as required by Article III of the Constitution. *Morrison v. Board of Educ.*, 521 F.3d 602, 608 (6th Cir. 2008). A litigant demonstrates Article III standing–or constitutional standing–by tracing a concrete and particularized injury to the defendant, whether actual or imminent, and by establishing that a favorable judgment would provide redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007).

A second part of the standing inquiry involves the doctrine of prudential standing. *Prime Media, Inc.*, 485 F.3d at 349. "Unlike constitutional standing, which involves absolute and irrevocable justiciability requirements under Article III, prudential standing is a judicially created doctrine relied on as a tool of 'judicial self-governance.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Prudential standing requirements preclude litigation in federal court when the asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens or where, instead of litigating his own legal rights, the plaintiff purports to rest his claim to relief on the legal rights of third parties. *Id.* To satisfy prudential standing, the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the policy or statute in question. *Id.* A plaintiff who has established constitutional injury under a provision of a policy, ordinance or statute as applied to him may also bring a facial challenge, under the overbreadth doctrine, to vindicate the rights of others under that provision who are not before the court. *Id.* at 350. The Supreme Court has held that the injury-in-fact requirement still applies to overbreadth claims under the First Amendment. *Id.* (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) ("holding that, '[t]o bring a cause of action in

13

federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some threatened or actual injury resulting from the putatively illegal action.'" ).

An allegation of subjective "chill" of First Amendment free speech rights, without more, is not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm. *Morrison*, 521 F.3d at 608 (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Where a litigant alleges inhibition of free speech rights, without proof of a concrete harm, federal courts routinely hold that no standing exists. *Id.* at 609. As explained below, the plaintiff did not submit proof of any concrete and particularized harm that is actual and imminent, and he alleges nothing more than a subjective "chill" of his First Amendment rights. *See id.* This is insufficient to confer standing on the plaintiff.

The defendants do not dispute that the open areas of the TTU campus where the plaintiff wishes to express his religious messages constitute designated public fora by virtue of TTU's written campus use policy.[2]  Where a designated public forum has been opened, the government may enforce content-based restrictions on speech only if they are narrowly drawn to serve a compelling government interest, and the government may enforce content-neutral time, place,

---

[2]While the plaintiff additionally argues that the open areas of the TTU campus constitute traditional public fora, such a contention may well be laid to rest by *Gilles v. Garland*, 281 Fed. Appx. 501 (6th Cir. 2008), where the panel majority in a campus evangelist case rejected "the notion that open areas on a public university campus are traditional public fora." *Id.* at 508-11 (relying on other campus evangelist cases, including *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006), and *Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007)). *See also ACLU v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005); *Bourgault v. Yudof*, 316 F.Supp.2d 411, 420 (N.D. Tex. 2004); *Bloedorn v. Grube*, 2009 WL 4110204 at **5-6 (S.D. Ga. Nov. 24, 2009).  Even if there is a fair argument that certain campus areas, such as perimeter sidewalks, are traditional public fora, the court need not resolve this issue because the standard applicable to traditional public fora and designated public fora is the same. *See Sonnier v. Crain,* — F.3d —, 2010 WL 2907484 at *2 (5th Cir. July 27, 2010) (holding that, type of forum need not be determined where standard is the same).

14

and manner regulations only if they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (*en banc*). A restriction is narrowly tailored when it does not burden substantially more speech than is necessary to further the government's legitimate interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989).

By requiring in advance an application for registration and a grant of permission to use campus property, TTU's campus use policy places a prior restraint on speech against which there is a heavy presumption of unconstitutionality. *Bowman*, 444 F.3d at 980. Such a permit requirement may be imposed, however, if the policy does not delegate overly broad licensing discretion to a governmental official, the policy is content-neutral, the policy is narrowly tailored to serve TTU's significant government interests, and the policy leaves ample alternative channels for communication.

The campus use policy is content-neutral, and it specifically permits individuals and groups to express religious messages on campus. Contrary to the plaintiff's argument, the policy is not vague and it does not place unbridled discretion in TTU officials to restrict speech. Rather, the policy places explicit limitations on the discretion that may be exercised by those charged with approving or denying applications for registration. The policy specifies nine (9) circumstances under which an application for registration may be denied. These specified circumstances constitute reasonable time, place, and manner restrictions, and the policy is narrowly tailored to serve the significant governmental interests of TTU in promoting the orderly conduct of activities on campus and preventing the interruption of the university's normal

15

educational mission. The policy also leaves open ample alternative channels of communication. *See id.*

While the fourteen (14) business day advance notice period for filing an application for registration may be slightly longer than the advance notice periods approved in other cases, *see Bowman*, 444 F.3d at 982 (upholding three-day advance notice period); *Sonnier,* 2010 WL 2907484 at *7 (upholding seven-day advance notice period), the TTU policy allows the President or his or her designee to waive the 14 business day advance notice requirement and to consider a late-filed application for registration if the use of the property requested can be reasonably accommodated and adequate cause exists for the late filing of the application for registration. The application form to be completed by the individual or group seeking to utilize campus property is also narrowly tailored to require only that amount of information necessary to serve the significant interests of TTU in maintaining order and preventing interruption of its educational mission.

The plaintiff did not at any time use the form to file an application for registration to request use of TTU campus property. By ignoring the application requirement entirely, the plaintiff precluded campus officials from considering, in light of the policy's requirements, the plaintiff's desire to speak, to display signs, and to distribute literature on the TTU campus. Thus, the plaintiff has not shown that the campus use policy was applied to him, and he has not suffered any concrete and particularized harm that is actual or imminent resulting directly from the application of the policy to him. *See Gilles v. Davis*, 427 F.3d 197, 208 (3rd Cir. 2005).

Moreover, the plaintiff does not dispute that, when he appeared on the TTU campus unannounced on April 7, 2009, and asked to speak without submitting an application for

registration in accordance with the campus use policy, Ochsenbein informed the plaintiff that he could speak on the north patio of the University Center. *See Gilles v. Torgersen*, 71 F.3d 497, 500 (4th Cir. 1995) (vacating judgment and reversing for lack of standing because Gilles was not prevented from preaching and university acted as sponsor on his behalf). The plaintiff rejected Ochsenbein's permission to speak on the north patio because the plaintiff preferred to speak in other areas of the campus more to his liking. But plaintiff does not have the authority to determine when, where, or if he will speak on the TTU campus. TTU has such authority in accordance with its campus use policy. University officials are not required to make all of the campus grounds and facilities equally available to students and non-students alike, nor must they grant free access to all of the buildings and grounds. *See Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). TTU, as owner of the property, was within its legal rights to warn the plaintiff that he could be arrested for trespass if he did not comply with the campus use policy. *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) ("Public property is property, and the law of trespass protects public property, as it protects private property, from uninvited guests."). Plaintiff chose to leave the campus rather than face arrest and he was, in fact, not arrested by Officer Lambert.

The plaintiff's failure to show a concrete and particularized injury that is actual or imminent undercuts his facial constitutional challenge as well. The injury-in-fact requirement applies to First Amendment overbreadth claims, *Prime Media, Inc.*, 485 F.3d at 350, and the plaintiff's assertion of a subjective "chill" on First Amendment rights, without more, is insufficient to establish standing to proceed on the overbreadth claim. *See Morrison*, 521 F.3d at 608.

**B. Preliminary injunction factors**

The reasoning that supports the court's finding that the plaintiff lacks standing also supports findings that the plaintiff has not shown a likelihood of success on the merits of his constitutional claims and that the plaintiff has not shown irreparable harm. Therefore, the court relies on the analysis above to hold that the plaintiff has not satisfied these two prerequisites for a preliminary injunction. Further, the plaintiff has not shown that granting an injunction would not cause harm to the defendants or that granting an injunction would be in the public interest. TTU's campus use policy appears to be narrowly tailored to serve TTU's significant governmental interests in maintaining the order and educational mission of a public university campus, and it is in the interest of TTU and the public to enforce such a policy. Accordingly, the court determines that a preliminary injunction will not issue.

**C. Motion to Dismiss**

Under Federal Rule of Civil Procedure 12(b)(6), the individual defendants, in their individual capacities, move for dismissal on the ground of qualified immunity and on the ground that plaintiff did not include sufficient factual allegations in his Verified Complaint to satisfy *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937, 1946-47 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 550). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint must contain either direct or inferential allegations

18

respecting all of the material elements to sustain a recovery under some viable legal theory. *Id.* at 944; *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

The court finds that the Verified Complaint does not contain sufficient facts alleging that the plaintiff suffered a concrete and particularized injury that is actual or imminent in order to confer standing on the plaintiff to bring the constitutional claims, and therefore, the plaintiff has not satisfied the *Twombly* and *Iqbal* pleading standards to show that his claims have facial plausibility. Consequently, dismissal for failure to state a claim under Rule 12(b)(6) is appropriate.

Further, the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine balances two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Because qualified immunity is an immunity from suit rather than a mere defense to liability, it is effectively lost if a case is erroneously allowed to go to trial. *Id.* Thus, the Supreme Court emphasizes that the driving force behind the doctrine is a desire to ensure that insubstantial claims against government officials are resolved prior to discovery, and lower courts are repeatedly counseled to resolve immunity questions at the earliest possible stage in the litigation. *Id.*

To determine if qualified immunity applies, the court must decide whether the facts the plaintiff has alleged make out a violation of a constitutional right, and if so, whether the right at

19

issue was "clearly established" at the time of the defendants' alleged misconduct. *Id.* at 815-16. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* The court may exercise its sound discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case. *Id.* at 818.

In light of the analysis above supporting the findings that the plaintiff lacks standing and has not shown a likelihood of success on the merits of his claims, the court finds that the plaintiff has not sufficiently alleged a violation of the First and Fourteenth Amendments to avoid the application of qualified immunity. Consequently, the defendants who are sued in their individual capacities–Dean Boucher, Ochsenbein, and Officer Lambert–are entitled to qualified immunity because their conduct did not violate plaintiff's clearly established constitutional rights. The plaintiff's claims against these three defendants in their individual capacities will be dismissed.

## CONCLUSION

For all of the reasons stated, the court finds that the plaintiff lacks standing to bring his facial and as-applied constitutional challenges. The court's reasoning, which supports the ruling on standing, also supports a finding that the plaintiff has not satisfied the four prerequisites to obtain injunctive relief. Therefore, the plaintiff's Motion for Preliminary Injunction (Docket Entry No. 2), will be denied. The defendants' Motion To Dismiss Defendants In Their Individual Capacities (Docket Entry No. 13) will be granted.

ALETA A. TRAUGER
United States District Judge

20